1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

NETWORK APPLIANCE, INC.,

                  Plaintiff,

    v.

BLUEARC CORP.,

                 Defendant.

_____/

No. C 03-5665 MHP

**MEMORANDUM & ORDER**
**Re: Cross-Motions for Summary**
**Judgment of Infringement and**
**Noninfringement; Defendant's Motion**
**for Summary Judgment on Damages**

       Plaintiff Network Appliance filed this action in the United States District Court for the District of Delaware, alleging infringement of three patents that relate to network file server architecture and operating system software. On defendant's motion, the District of Delaware ordered the action transferred to this court on December 16, 2003. Now before the court are the parties' cross-motions for summary judgment of infringement and noninfringement with respect to the asserted claims of United States Patent Nos. 6,065,037 ("'037 Patent"). In addition, defendant moves for summary judgment that is has not infringed the asserted means-plus-function claims of the United States Patent Nos. 5,802,366 ("'366 Patent") and 5,931,918 ("'918 Patent") and seeks summary adjudication with respect to certain aspects of plaintiff's alleged damages. Having fully considered the parties' arguments and submissions and for the reasons set forth below, the court enters the following memorandum and order.

**UNITED STATES DISTRICT COURT**
For the Northern District of California

BACKGROUND

I.        The Patents and the Accused Devices

The patents that are the subject of this infringement action relate to computer designs ("architectures") and storage systems that were developed by Auspex Systems, Inc. in the late 1980s.  The '366 Patent, issued on September 1, 1998, and the '918 Patent, issued on August 3, 1999, disclose substantially identical multiprocessor file server architectures employing separate processors to perform file system control and non-file system control tasks.  The '037 Patent, issued on May 16, 2000, describes a computer operating system that allows for the implementation of the file server architectures claimed by the '366 and '918 Patents.  The court has set forth a detailed description of the patented inventions in a number of previous orders and need not repeat that description for purposes of adjudicating the motions that are now before it.

Plaintiff Network Appliance, a competitor in the file server market that acquired the patents in suit from Auspex in June 2003, has asserted that a host of the patents' claims are infringed by two network file server product lines sold by defendant BlueArc Corp.  Defendant's "Silicon Server"- and "Titan"-model file servers have also been previously described by the court.  See generally May 17, 2005 Order Re Cross-Motions for Summary Judgment at 3-5 (hereinafter "May 2005 Order").  However, the instant motions require a more detailed description of certain aspects of the structure and function of the BlueArc Severs.

As the court noted in its May 2005 order, both the Silicon Server and Titan file servers resemble the preferred embodiments of the patents in suit in that they are comprised of three basic functional units, which the court will refer to as "modules": a network interface module, a file system module, and storage interface module.  Joint Statement Re '366 and '918 Patents ¶ 1.[1]  These modules are each associated with a microprocessor that participates in responding to requests (including file system requests) from client computers on a data network.  Id. ¶ 3.[2]  However, on both BlueArc Servers, much of the processing of such requests is performed by "field programmable gate arrays" ("FPGAs").  See generally Willis Decl. ¶¶ 10-22; Faillace Supp. Decl. ¶¶ 15-26.  An FPGA is a microchip consisting of an array of logic elements such as gates or latches that implements an algorithm.  Carter Decl. ¶ 13.  As its name implies, an FPGA

can in most cases be reprogrammed after its manufacture.  Id. ¶ 18; Faillace Supp. Decl. ¶ 29.  However, an FPGA differs from a programmable microprocessor in that its configuration (and hence the algorithm that it executes) is typically fixed by the design of the computer system in which it is installed.  Carter Decl. ¶ 18.  In the context of file server design, the primary advantage of FPGAs relative to programmable microprocessors lies in the greater speed with which FPGAs can execute a particular algorithm.  Id. ¶ 14; Willis Decl. ¶ 24.

The network interface, file system, and storage interface modules of the BlueArc Servers each include multiple FPGAs dedicated to responding to file system requests from clients on the network.  See generally Willis Decl. ¶¶ 10-22.  The extent to which the FPGAs work cooperatively with the processors on each module varies from module-to-module, as well as between the Silicon Server and the Titan file servers.  On both BlueArc Servers, the routine processing of file system requests by the network interface and storage interface modules is carried out by FPGAs, with the microprocessor located on that module handling only management requests, errors, and other "exceptional conditions."  Id. ¶¶ 10-17, 20-22; see also Faillace Supp. Decl. ¶¶ 16-17, 22-26.  The extent to which the processors located on the servers' file system modules are involved in the processing of file system requests is more substantial (albeit less so in the Titan than in the Silicon Server), with the FPGAs on those modules primarily performing message-passing functions.  Willis Decl. ¶¶ 18-19.  In all cases, the algorithm carried out by a particular FPGA is determined in the design of the BlueArc Servers and is not modified after design and debugging of the servers' hardware components has been completed.  Carter Decl. ¶¶ 18, 20.

II.   Procedural History

On July 15, 2003, plaintiff filed an action in the United States District Court for the District of Delaware, alleging that defendant had infringed its exclusive rights in the '366, '918, and '037 Patents.  That action was transferred to this court on December 16, 2003.  Following Markman hearings held on September 30, 2004 and December 7, 2004, the court issued two separate orders construing the claims of the patents in suit.  See November 30, 2004 Claim Construction Order (hereinafter "First Claim Construction Order") (construing non-means-plus-function claim terms); January 7, 2005 Claim Construction Order (hereinafter "Second Claim Construction Order") (construing means-plus-function

1    terms).

2        Following the issuance of the claim construction orders, the parties submitted a host of summary

3    judgment motions, a number of which have been addressed by the court in two previous orders.  In the first

4    of those orders, the court granted plaintiff's motion for summary judgment of infringement with respect to

5    claims 7 through 16 of the '918 Patent and denied the parties' cross-motions for summary judgment on the

6    issue of whether claims 1, 3, and 4 of the '366 Patent are infringed by the BlueArc Servers.  See generally

7    May 2005 Order.[3]  In the second order, the court addressed the parties' arguments concerning the validity

8    of the patents in suit and concluded that plaintiff was entitled to summary judgment of validity with respect

9    to the claims 1 through 9 and claims 11 through 13 of the '037 Patent as well as with respect to the asserted

10   means-plus-function claims of the '366 and '918 Patents (claims 5 through 9 of the '366 Patent and claims

11   1, 2, 4, and 5 of the '918 Patent).  See generally Order Re Cross-Motions for Summary Judgment of

12   Validity and Invalidity (hereinafter "Validity Order").  However, the court held that claims 7 through 10 and

13   claims 12 through 15 of the '918 Patent were anticipated as a matter of law and thus granted defendant's

14   motion for summary judgment of invalidity with respect to those claims.  See id. at 21-28.  In addition,

15   addressing the validity of claims 1 and 3 of the '366 Patent, the court held that those claims were as a

16   matter of law not anticipated but nonetheless concluded that genuine issues of material fact precluded entry

17   of summary judgement on the issue of obviousness.  Id. at 10-15.

18       Now before the court are four additional summary judgment motions that have been filed by the

19   parties.  Two of these motions pertain to the '037 Patent, with plaintiff seeking summary judgment of

20   infringement with respect to claims 1 and 7 of the '037 Patent and defendant cross-moving for summary

21   judgment of noninfringement as to those claims as well as with respect to the other claims of the '037 Patent

22   that are at issue in the instant action.  In addition, defendant moves for summary judgment of

23   noninfringement as to the asserted means-plus-function claims of the '366 and '918 Patents.  Finally,

24   defendant moves for summary judgment as to certain aspects of plaintiff's alleged damages.  The court

25   addresses the issues raised by each of these motions in the discussion that follows.

26

27   LEGAL STANDARD

28

4

**UNITED STATES DISTRICT COURT**
For the Northern District of California

I.    <u>Summary Judgment</u>

As in any other civil action, summary judgment is proper in a patent infringement action when the pleadings, discovery, and affidavits show that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); <u>see also</u> <u>Southwall Techs., Inc. v. Cardinal IG Co.</u>, 54 F.3d 1570, 1575 (Fed. Cir.), <u>cert. denied</u>, 516 U.S. 987 (1995).  Material facts are those which may affect the outcome of the case.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict in favor of the nonmoving party.  <u>Id.</u>

The party moving for summary judgment bears the burden of identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact. <u>Celotex Corp. v. Cattrett</u>, 477 U.S. 317, 323 (1986).  On an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case."  <u>Id.</u> at 325; <u>Crown Operations Int'l, Ltd. v. Solutia, Inc.</u>, 289 F.3d 1367, 1377 (Fed. Cir. 2002).  On the other hand, where the moving party bears the burden of proof on an issue, it must submit evidence sufficient to establish that no reasonable jury could find against it on that issue at trial.  <u>See</u> <u>Frank's Casing Crew & Rental Tools, Inc. v. Weatherford Int'l, Inc.</u>, 389 F.3d 1370, 1376 (Fed. Cir. 2004); <u>Gart v. Logitech, Inc.</u>, 254 F.3d 1334, 1339 (Fed. Cir. 2001), <u>cert. denied</u>, 534 U.S. 1114 (2002).

II.    <u>Patent Infringement</u>

Under section 271 of the Patent Act, 35 U.S.C. § 271, liability for patent infringement may be imposed on any person who without permission of the patentee "makes, uses, offers to sell, or sells any patented invention[] within the United States or imports into the United States any patented invention during the term of the patent therefor."  <u>Id.</u>  The rights granted to the patentee are defined by the patent's claims. <u>Markman v. Westview Instruments, Inc.</u>, 517 U.S. 370, 373 (1996).  In determining whether an allegedly infringing device falls within the scope of the claims, a two-step process is used: first, the court must determine as a matter of law the meaning of the particular claim or claims at issue; and second, it must consider whether the accused product infringes one or more of the properly construed claims.  <u>Id.</u> at 384;

5

UNITED STATES DISTRICT COURT
For the Northern District of California

1   Allen Eng'g Corp. v. Bartell Indus., Inc., 299 F.3d 1336, 1344 (Fed. Cir. 2002). The second inquiry is a

2   question of fact, although summary judgment of infringement or noninfringement may nonetheless be

3   appropriate when no genuine dispute of material fact exists. Irdeto Access, Inc. v. Echostar Satellite

4   Corp., 383 F.3d 1295, 1299 (Fed. Cir. 2004) (quoting Bai v. L & L Wings, Inc., 160 F.3d 1350, 1353

5   (Fed. Cir. 1998)).

6          The patentee bears the burden of proving infringement by a preponderance of the evidence.

7   Laitram Corp. v. Rexnord, Inc., 939 F.2d 1533, 1535 (Fed. Cir. 1991). This burden can be met by

8   showing that the patent is infringed either literally or under the doctrine of equivalents. See Linear Tech.

9   Corp. v. Impala Linear Corp., 379 F.3d 1311, 1318 (Fed. Cir. 2004). To support a finding of literal

10  infringement, the patentee must establish that "every limitation recited in the claim appears in the accused

11  product, i.e., the properly construed claim reads on the accused product exactly." Jeneric/Pentron, Inc. v.

12  Dillon Co., 205 F.3d 1377, 1382 (Fed. Cir. 2000) (citing Amhil Enters. Ltd. v. Wawa, Inc., 81 F.3d

13  1554, 1562 (Fed. Cir. 1996)). Alternatively, where one or more elements of the claim are not literally

14  present in the allegedly infringing product or process, infringement may nonetheless be found under the

15  doctrine of equivalence if the differences between the accused device and the patented invention are

16  "insubstantial." Honeywell Int'l, Inc. v. Hamilton Sundstrand Corp., 370 F.3d 1131, 1139 (Fed. Cir.

17  2004) (quoting Eagle Comtronics, Inc. v. Arrow Communication Labs., Inc., 305 F.3d 1303, 1315 (Fed.

18  Cir. 2002)), petition for cert. filed, 73 U.S.L.W. 3146 (2004). As with literal infringement, this inquiry

19  requires an element-by-element comparison of the patented invention to the accused device.

20  Warner-Jenkinson Co. v. Hilton Davis Chem. Co., 520 U.S. 17, 40 (1997). Consequently, in applying the

21  doctrine of equivalents, the court must consider whether the accused device "contain[s] elements that are

22  either identical or equivalent to each claimed element of the patented invention." Id.; EMI Group N. Am.,

23  Inc. v. Intel Corp., 157 F.3d 887, 896 (Fed. Cir. 1998), cert. denied, 526 U.S. 1112 (1999).

24         Under the classic formulation of the doctrine of equivalents set forth in Graver Tank &

25  Manufacturing Co. v. Linde Air Products Co., 339 U.S. 605 (1950), a feature of the accused device is

26  "equivalent" to an element of claimed invention if it performs substantially the same function in substantially

27  the same way to achieve substantially the same result. Id. at 608 (citations omitted); see also Schoell v.

28

6

UNITED STATES DISTRICT COURT
For the Northern District of California

1    Regal Mar. Indus., Inc., 247 F.3d 1202, 1209-10 (Fed. Cir. 2001).  However, as the Supreme Court

2    subsequently acknowledged in Warner-Jenkinson, this particular "linguistic framework" may not be

3    appropriate in every case.  520 U.S. at 39-40.  Rather, the Court observed that "[a]n analysis of the role

4    played by each element in the context of the specific patent claim [must] inform the inquiry as to whether a

5    substitute element matches the function, way, and result of the claimed element, or whether the substitute

6    element plays a role substantially different from the claimed element."  Id. at 40.  A number of other

7    considerations may also be relevant in determining the range of equivalents to which the claimed invention is

8    entitled, including the prosecution history of the patent in suit, the pioneer status of the invention (or lack

9    thereof), and the limitations on patentability of the allegedly equivalent device that would have been imposed

10   by prior art extant on the date of invention.  Intel Corp. v. International Trade Comm'n, 946 F.2d 821, 842

11   (Fed. Cir. 1991); see also K-2 Corp. v. Salomon S.A., 191 F.3d 1356, 1366-68 (Fed. Cir. 1999).

12

13   DISCUSSION

14   I.      Infringement of the '037 Patent

15           A.      Literal Infringement

16           The first issue before the court is whether the BlueArc Servers literally infringe claims 1

17   through 9 and claims 11 through 13 of the '037 Patent.  The court begins this analysis with claim 1, which

18   claims:

19           A computer system employing a multiple facility operating system architecture, said
             computer system comprising:

20
             a)      a plurality of processor units provided to co-operatively execute a predetermined
21                   set of operating system peer-level facilities, wherein each said processor units [sic]
                     is associated with a respective different one of said operating system peer-level
22                   facilities and not another of said operating system peer level facilities, and wherein
                     each of said operating system peer-level facilities constitutes a respective separately
23                   executed software entity which includes a respective distinct set of peer-level
                     facility related functions, each said processor unit including:
24                   i)      a processor capable of executing a control program; and
                     ii)     a memory store capable of storing said control program, said processor
25                           being coupled to said memory store to obtain access to said control
                             program,
26
             said memory store providing for the storage of a first control program portion that
27           includes a one of said respective distinct sets of operating system peer-level facility
             related functions and that corresponds to a one of said predetermined operating

28

                                                       7

system peer-level facilities, and a second control program portion that provides for the implementation of a multi-tasking interface function, said multi-tasking interface function being responsive to control messages for selecting for execution a one of said peer-level facility related functions of said one of said predetermined operating system peer-level facilities and responsive to said one of said predetermined operating system peer-level facilities for providing control messages to request or in response to the performance of said predetermined peer-level facility related functions of another operating system peer-level facility; and

b)      a communications bus that provides for the interconnection of said plurality of processor units, said communications bus transferring said control messages between the multi-tasking interface functions of said predetermined set of operating system peer-level facilities.

'037 Patent, 55:18-58.  Both parties assert that they are entitled to judgment as a matter of law on the issue of whether claim 1 is literally infringed by the BlueArc Servers.

The standard for establishing literal infringement is straightforward: a patentee seeking to prove literal infringement of a patent's claim must show that every element of the properly construed claim reads exactly on the accused device.  See Jeneric/Pentron, 205 F.3d at 1382.  Here, it is apparent that this inquiry must begin and end with the "operating system peer-level facility" element of claim 1.  In its November 2004 claim construction order, the court construed this term as "a major functional subsystem of the operating system constituted as a separately executed software entity."  First Claim Construction Order at 27.  This definition, which is derived from the '037 Patent's prosecution history, imposes two limitations on the peer-level facility claim term: first, each of the claimed plurality of peer-level facilities must be "a *major* functional subsystem of the operating system"; and second, each facility must be "constituted as a separately executed *software* entity."  Id. (emphasis added).  Comparing these limitations to the accused devices, the most readily apparent "major" subsystems of the operating systems of the Silicon Server and Titan file servers are their respective network interface, file system, and storage interface modules.  The parties agree that each of these modules is comprised of both a software element (a microprocessor) and hardware components (FPGAs).  Joint Statement Re '366 and '918 Patents ¶ 2.  Thus, seeing that "constituting," like "consisting," is a limiting term when used in the drafting of patent claims, see Robert C. Faber, Landis on Mechanics of Patent Claim Drafting § 8, at 2-15 (2002), there can be no serious dispute that the BlueArc Servers' network interface, file system, and storage interface modules are not "constituted

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1    as [] respective separately executed software entit[ies]" and thus cannot meet the peer-level facility

2    limitation of claim 1.

3         While the clear implication of this conclusion is that the BlueArc Servers do not literally infringe

4    claim 1, plaintiff attempts to avoid this result by defining the "major functional subsystem[s] of the operating

5    system" as the processors located within each of the BlueArc Servers' modules.  In so doing, plaintiff seeks

6    to draw a distinction between the file servers themselves and the operating systems running on those

7    servers, arguing that the latter is necessarily implemented in software.  Admittedly, there is some ambiguity

8    as to whether a computer "operating system" must consist exclusively of software.  At least one technical

9    dictionary, <u>The Authoritative Dictionary of IEEE Standards Terms</u> (7th ed. 2000) (hereinafter "<u>IEEE</u>

10   <u>Dictionary</u>"), imposes no such requirement, defining "operating system" as "[a] collection of software,

11   firmware, *and hardware* elements that controls the execution of computer programs and provides services

12   such as computer resource allocation, job control, input/output control, and file management in a computer

13   system."  <u>Id.</u> at 767 (emphasis added).  On the other hand, the ordinary meaning of "operating system" also

14   encompasses "the most important program that runs a computer," thereby implying that an operating system

15   must be a computer program executed by a processor.  <u>Webopedia</u>, at

16   http://www.webopedia.com/TERM/ o/operating_system.html (last modified Jan. 4, 2002).  However, if it

17   assumed that this latter definition applies and an operating system must consist exclusively of software, it is

18   unclear whether the BlueArc Servers have any operating system whatsoever.  Indeed, in discussing the

19   functions performed by "the most important program that runs a computer," the above-cited reference

20   notes that the "basic tasks" performed by an operating system include "recognizing input from the

21   keyboard, sending output to the display screen, keeping track of files and directories on the disk, and

22   controlling peripheral devices such as disk drives and printers."  <u>Id.</u>  It is undisputed that the BlueArc

23   Servers perform these tasks using a combination of software and hardware.  Thus, assuming that the

24   accused devices have "operating systems," those operating systems must properly be construed to consist

25   of hardware as well as software.

26         Having resolved what an operating system does (if not necessarily what it is), the court turns to

27   plaintiff's theory of infringement, which would require a jury to conclude that the tasks carried out by the

28   microprocessors located on a plurality of the BlueArc Servers' modules are "respective distinct sets" of

UNITED STATES DISTRICT COURT
For the Northern District of California

1   "major" operating system functions.  It is at least arguable that the functions performed by the processors

2   located in the servers' respective file system control modules meet this limitation.  However, the processors

3   located in the network and storage interface modules handle only management requests, errors, and other

4   exceptional conditions.  Willis Decl. ¶¶ 13, 18, 20.  In other words, the processors perform substantially

5   identical rather than "distinct" sets of functions.[4]

6        Moreover, and more fundamentally, the handling of "exceptional conditions" is not carried out by a

7   separately executed software entity that comprises one of the *major* subsystems of the BlueArc Servers'

8   operating systems.  While it may be true that the definition of "major" is open to interpretation, the meaning

9   of that term as it is used in '037 Patent's claims must be interpreted in light of the patent's specification and

10  prosecution history.  See Teleflex, Inc. v. Ficosa North Am. Corp., 299 F.3d 1313, 1324-25 (Fed. Cir.

11  2002).  Of particular relevance here is a passage of the prosecution history in which a claim in Patent

12  Application No. 404,885 ("'885 Application"), a parent application of the patents in suit, was rejected by

13  the examiner for indefiniteness.  See First Claim Construction Order at 24.  In response, the applicants

14  amended certain claim elements and also sought to clarify the definition of the rejected claim's "primary

15  peer-level facility" term that the examiner had identified as inadequately defined, observing:

16          Reliance on the specification to provide definitions of terms utilized in a claim, where such
            terms do not otherwise have a conventional definition, is not improper.  Specifically, the
17          specification of the '885 Application substantially defines the primary peer-level facilities as,
            in the context of the UNIX operating system, the major functional subsystems of the
18          operating system constituted as separately executed software entities separate from a
            conventional UNIX kernel.

19  Id. at 24-25 (citations and original alterations omitted).  In other words, the "major  functional subsystems"

20  of the operating system upon which the '037 Patent's inventors relied for the purpose of obtaining a patent

21  were the peer-level facilities disclosed in the specification of the '885 Application: namely, one or more

22  "network controller," one or more "file system controller", and one or more "storage controller."

23        It is axiomatic that "[c]laims may not be construed one way in order to obtain their allowance and in

24  a different way against accused infringers."  Southwall Techs., 54 F.3d at 1579 (citation omitted).  Thus,

25  construing claim 1 in light of the representations made for the purpose of securing the '037 Patent, it is

26  apparent that the "major functional subsystem[s]" of the patented operating system must perform functions

27  similar to network control, file system control, and storage control.  These are precisely the same tasks that

28

are performed by the network interface, file system, and storage interface modules of the BlueArc Servers, and it is these "distinct" modules that are the "separately executed" facilities of which those servers are comprised.  Accordingly, because there is no dispute that these entities are not software entities, the court holds that no reasonable jury could find the accused devices to be comprised of a plurality of "operating system peer-level facilities."

For that reason, the court is compelled to conclude that claim 1 of '037 Patent is not literally infringed by the BlueArc Servers.  The same is necessarily true of claims 1 through 5, which depend on claim 1.  As for the other asserted independent claims of the '037 Patent, claim 7 includes the same "operating system peer-level facility" element that is found in claim 1, and claim 11 recites a plurality of "component facilities," a term that the '037 Patent's inventors used interchangeably with the "operating system level peer-level facilities" term found in claims 1 and 7. See Ferrall Decl. in Support of Def.'s Reply, Exh. GG at 1 (equating the terms in an informal communication with the Patent Office).  The court therefore holds that defendant is entitled to summary judgment that the BlueArc Servers do not literally infringe any of the asserted claims of the '037 Patent.

UNITED STATES DISTRICT COURT
For the Northern District of California

B.      Doctrine of Equivalents

While the preceding discussion makes clear that the BlueArc Servers do not have a plurality of peer-level facilities constituted as separately executed software entities, plaintiff nonetheless argues that infringement may be found under the doctrine of equivalents.  Specifically, plaintiff contends that a reasonable jury could find that the combination of FPGAs and a microprocessor found in each of the modules of the BlueArc Servers is equivalent to one of the operating system peer-level facilities claimed by the patented invention, thereby precluding entry of summary judgment in defendant's favor.  For its part, defendant argues that any equivalent to the claimed "software entity" is absent from the accused devices and thus urges the court to grant its motion for summary judgment of noninfringement.

The gravamen of the parties' dispute regarding the equivalency issue is whether the combination of hardware and software in each of the BlueArc Servers' modules can be found to be equivalent to one of the claimed plurality of "respective separately executed software entit[ies]."  At first glance, plaintiff's attempt to prove infringement in this fashion might appear to be handicapped by the fact that "hardware" is an antonym of "software."  Nevertheless, the Federal Circuit has observed that so long as a person of ordinary skill in the art would view hardware and software as "interchangeable substitutes," it is possible to find that hardware and software elements used to perform the same computational function are equivalents, i.e., that they differ insubstantially in function, way, and result.  See Overhead Door Corp. v. Chamberlain Group, Inc., 194 F.3d 1261, 1269-70 (Fed. Cir. 1999); see also Interactive Pictures Corp. v. Infinite Pictures, Inc., 274 F.3d 1371, 1383 (Fed. Cir. 2001), cert. denied, 537 U.S. 825 (2002).

That being the case, the decisions that plaintiff cites for the proposition that such interchangeability could be found to be present here were decided on their own facts, and the Federal Circuit has in no way suggested that hardware and software implementations of an algorithm can always be equivalent.  Of particular relevance here is that court's decision in Overhead Door.  The patent at issue in that case claimed a garage-door opener having a "memory selection switch" element that was limited in its literal scope to a hardware structure.  194 F.3d at 1269-70.  While such a switch was clearly absent from the defendant's allegedly infringing garage-door opener, the patentee nonetheless argued that the accused device infringed under the doctrine of equivalents because it employed  a software-driven memory selection scheme that was equivalent to the claimed hardware switch.  Id.  The court held that the district court erred in granting

12

1   summary judgment of noninfringement, observing that the patent in suit lacked "any clear structural

2   limitations that preclude[d] a reasonable jury from finding the software system equivalent to the claimed

3   system." Id. at 1271.

4          Plaintiff appears to suggest that the mere fact that the Overhead Door court permitted a jury to

5   entertain the patentee's equivalency argument dictates the outcome of the case at bar.  However, it is the

6   language of the '037 Patent's claims, and not the theoretical possibility that hardware and software can be

7   found to be interchangeable, that ultimately governs the scope of plaintiff's exclusive rights.  Indeed,

8   Overhead Door explicitly based its holding on the absence of any "clear structural limitations" in the

9   asserted claim that would have otherwise precluded a reasonable jury from finding equivalency.  See 194

10  F.3d at 1261.

11         That simply is not the case here.  Although it may be true that the BlueArc Servers achieve results

12  similar to those achieved by the patented file server, they do so by a substantially different arrangement of

13  elements.  Again focusing on claim 1, the patent claims a structure in which a plurality of processors include

14  peer-level facilities, each of which is stored in the "first control program portion" of a "memory store."  It

15  would take considerable powers of imagination to identify any combination of hardware and software

16  components in the accused devices that embodies these claim elements, and plaintiff does not make a

17  serious effort to do so, apparently believing that its citation to Overhead Door's "known interchangeability"

18  standard is enough to avoid summary judgment.  See Faillace Supp. Decl. ¶¶ 29-30.  However, while it

19  may be true the modules of the BlueArc Servers perform the same functions as the claimed peer-level

20  facilities, the Federal Circuit law clearly provides that such functional interchangeability is not sufficient to

21  support a finding of infringement where a claim contains "clear structural limitations."  See, e.g., Sage

22  Prods., Inc. v. Devon Indus., Inc., 126 F.3d 1420, 1425-26 (Fed. Cir. 1997) (noting that the doctrine of

23  equivalents cannot be applied in a manner that would "effectively remove" a structural limitation of a claim).

24  Thus, having patented an invention that includes such structural limitations, plaintiff cannot rely on the

25  "functional interchangeability" of substantially different structures in order to sweep any computer

26  architecture that is functionally equivalent to that invention into the scope of the patent's claims.

27         Yet that is precisely what plaintiff has attempted to do in seeking to prove that each of the BlueArc

28  Servers' modules includes an equivalent to one of the claimed "operating system peer-level facilities."

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

13

UNITED STATES DISTRICT COURT
For the Northern District of California

1  Rather than identifying specific features of the accused devices that are identical or equivalent to the

2  "control program" and "memory store" claim elements, plaintiff's theory of equivalency would leave the jury

3  to speculate as to where those elements could be found among the assortment of software and hardware

4  components that plaintiff has identified as "major functional subcomponents of the operating system."  Such

5  a theory is as a matter of law insufficient to support a finding that claim 1 is infringed.

6  This conclusion compels the court to grant defendant's motion for summary judgment of

7  noninfringement with respect to claim 1.  Furthermore, because similar structural limitations are present in

8  each of the other two assertedly infringed independent claims of the '037 Patent (claims 7 and 11), any

9  equivalents to the "operating system peer-level facilities" or "component facilities" elements of those claims

10  is likewise absent from the accused devices.  The court therefore holds that defendant is entitled to

11  summary judgment of noninfringement with respect to each of the asserted claims of the '037 Patent.[5]

12  II.      Infringement of the Means-Plus-Function Claims of the '366 and '918 Patents

13      A.      Literal Infringement

14  The parties also cross-move for summary judgment as to whether defendant's network file servers

15  infringe a number of means-plus-function claims of the '366 and '918 Patents.  The court first addresses the

16  issue of literal infringement, beginning with claim 1 of the '918 Patent, which claims the following:

17  A network file server for use with a data network and a mass storage device, said network
   file server including a first unit comprising:

18  means for decoding file system requests from said network;

19  means for performing procedures for satisfying said file system requests, including accessing
   said mass storage device if required; and

21  means for encoding any file system reply messages for return transmission on said network,

22  said first unit lacking means in said first unit for executing any programs which make calls to
   any general purpose operating system.

24  '918 Patent, 127:1-13.

25  Under 35 U.S.C. § 112 ¶ 6, any claim element drafted in means-plus-function format must be

26  "construed to cover the corresponding structure, material, or acts described in the specification and

27  equivalents thereof."  35 U.S.C. § 112 ¶ 6.  Consequently, a party seeking to establish that a means-plus-

28  function term is literally infringed must show that "the relevant structure in the accused device perform[s] the

14

UNITED STATES DISTRICT COURT
For the Northern District of California

1    identical function recited in the claim and [is] identical or equivalent to the corresponding structure in the

2    specification." Frank's Casing Crew & Rental Tools, 389 F.3d at 1378 (quoting Odetics, Inc. v. Storage

3    Tech. Corp., 185 F.3d 1259, 1267 (Fed. Cir. 1999)).  Thus, a means-plus-function claim element reads

4    literally on an accused device if a structure present in the accused device "performs the claimed function in

5    substantially the same way to achieve substantially the same result as the corresponding structure described

6    in the specification."  Id.

7         There is no dispute that the BlueArc Servers perform functions identical to those recited in the

8    means-plus-function elements of claim 1.  Rather, the question before the court is whether the accused

9    devices include structures that are identical or equivalent to the "means for decoding file system requests,"

10   "means for performing procedures for satisfying . . . file system requests," and "means for encoding . . .

11   reply messages" that are disclosed in the '918 Patent's specification.  In its January 2005 claim construction

12   order, the court construed each of the claimed "means" for performing these functions as a matter of law.

13   With respect to each of the claimed functions, the court identified a corresponding structure that includes

14   one or more of the programmable microprocessors (or "controllers") described in the sole disclosed

15   embodiment of the invention.  See generally Second Claim Construction Order at 6-13.  Furthermore,

16   having identified those programmable microprocessors as structural limitations of the means-plus-function

17   terms, the court, relying on WMS Gaming, Inc. v. International Game Technology, Inc., 184 F.3d 1339

18   (Fed. Cir. 1999), held that the corresponding structure must also include the algorithms for carrying out the

19   claimed functions that are disclosed in the specification.  See Second Claim Construction Order at 6-13.

20        Thus, given that the specification describes a multiprocessor file server architecture programmed to

21   respond to Sun NFS filesystem requests from a data network, the court identified the structure

22   corresponding to the claimed "means for decoding" as the network controller of the invention's preferred

23   embodiment programmed to process incoming NFS requests and to convert those requests from the NFS

24   format to LNFS, a data format that the disclosed file server uses for internal communications among its

25   constituent processors.  Id. at 10-11.  The claimed "means for performing procedures" was defined to

26   include the network controller programmed as disclosed in the specification, the file controller programmed

27   as disclosed in the specification, the storage processor programmed as disclosed in the specification, the

28   disclosed system memory, and a VME Bus.  Id. at 13.  Finally, the court identified the structure

15

**UNITED STATES DISTRICT COURT**
For the Northern District of California

1   corresponding to the claimed "encoding" function as the network controller programmed to reverse the

2   steps of the decoding process.  Id. at 11.

3           Comparing these structures to the elements of the BlueArc Servers that carry out the claimed

4   "decoding," "performing procedures," and "encoding" functions, it is apparent that there are substantial

5   differences between the patented invention and the accused devices.  Taking the claimed decoding function

6   as an example, the BlueArc Servers divide the processes necessary to decode and encode NFS filesystem

7   requests between the network interface and file system control modules.  See Garbagnati Decl., Exh. B

8   (describing the processing of NFS requests in the Silicon Server and Titan file servers).  Specifically,

9   FPGAs located in the servers' network interface modules process the lower-layer protocols of the NFS

10  stack of an incoming NFS request, with procedures for processing the higher-level protocols performed by

11  the processor and FPGAs of the servers' file system boards.  Id.  In contrast, the court's construction of

12  the claimed "means for decoding" makes clear that the "decoding" function of the patented invention is

13  carried out by a single microprocessor that processes all of the necessary NFS protocol layers.  Second

14  Claim Construction Order at 11.  Simply put, these structures are substantially different.[6]

15          One would think that this would end the discussion of whether the BlueArc Servers infringe claim 1.

16  Nevertheless, plaintiff again argues that the "known interchangeability" of the respective designs of the

17  patented invention and accused devices creates a genuine issue of material fact as to whether the claimed

18  "means for decoding" (as well as the "means for encoding" and "means for performing procedures") is

19  present in the BlueArc Servers.  However, just as the fact that two structures are functionally

20  interchangeable is not by itself sufficient to support a finding of infringement under the doctrine of

21  equivalents, it is likewise inadequate to permit a reasonable jury to find that a means-plus-function claim

22  element is literally infringed.  See Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc., 145 F.3d

23  1303, 1309 (Fed. Cir. 1998).  Indeed, if anything, the concept of "equivalence" under section 112 ¶ 6 is

24  narrower, given that a means-plus-function claim element must be "sharply limited to the structure disclosed

25  in the specification and its equivalents"  J & M Corp. v. Harley-Davidson, Inc., 269 F.3d 1360, 1367

26  (Fed. Cir. 2001).

27          In other words, the issue here is not whether the BlueArc Servers perform the functions recited in

28  claim 1—it is undisputed that they do—but whether they do so using a substantially identical structure to

UNITED STATES DISTRICT COURT
For the Northern District of California

1   that which is disclosed in the specification.  Accord Chiuminatta, 145 F.3d at 1310 (observing that

2   evidence of known interchangeability "does not obviate the statutory mandate to compare the accused

3   structure to the corresponding structure").  For the reasons stated above, a reasonable jury would be

4   compelled to conclude that plaintiff has failed to make such a showing with respect to the "means for

5   decoding" element of claim 1.

6          The court could say the same with respect to the claimed "means for encoding" and "means for

7   performing procedures."  However, it need not to do so for purposes of adjudicating the instant motion,

8   given that the "means for decoding" limitation appears in each of the means-plus-function claims of the '366

9   and '918 Patents at issue.  Accordingly, the court holds that defendant is entitled to summary judgment that

10  none of the means-plus-function claims of the patents in suit is literally infringed by the BlueArc Servers.

11          B.      Doctrine of Equivalents

12         Although the court has held that the accused devices do not have any structure that is "equivalent"

13  to the claimed "means for decoding," it may nonetheless be possible for the devices to infringe under the

14  doctrine of equivalents, provided that the assertedly equivalent structure is "after-arising technology."  See

15  Chiuminatta, 145 F.3d at 1310-11.  However, even assuming that the BlueArc Servers satisfy this

16  requirement, a finding of infringement under the doctrine of equivalents must be premised upon the

17  conclusion that the accused structure "perform[s] substantially the same function, in substantially the same

18  way, to achieve substantially the same result, as the disclosed structure," or alternatively, that the any

19  differences between the accused and disclosed structures are "insubstantial." Kemco Sales, Inc. v. Control

20  Papers Co., 208 F.3d 1352, 1364 & n.6 (Fed. Cir. 2000) (citations omitted) (describing the latter,

21  "insubstantial differences" test as the "basic inquiry" under the doctrine of equivalents).

22         Here, however, it is apparent from the preceding discussion of the "means for decoding" claim

23  element that the BlueArc Servers do not "decod[e]" file system requests in the same way that the patented

24  inventions perform the claimed function.  Indeed, the structure for decoding file system requests that is

25  disclosed in the specifications of the '366 and '918 Patents—a processor located on the network control

26  board of a multiprocessor file server and programmed to process all layers of the NFS protocol stack—is

27  wholly absent from the network control modules of the BlueArc Servers.  See Garbagnati Decl., Exh. B.  It

28  is thus clear as a mater of law that the accused devices do not perform the claimed function in substantially

the same way as the patented inventions.  Accord Kemco, 208 F.3d at 1365 (noting that "[w]hen a court determines that the 'way' [or] 'result' [is] substantially different under a section 112, paragraph 6 equivalents analysis, a patentee cannot prevail under the doctrine of equivalents").  For the same reason, any reasonable jury would find that the differences between the disclosed "means for decoding" and the structural components of the BlueArc Servers that decode file system requests are substantial.  The court therefore holds that defendant is entitled to summary judgment that the BlueArc Servers do not infringe the means-plus-function claims of the patents in suit under the doctrine of equivalents.  Defendant's motion for summary judgment of noninfringement with respect to those claims is therefore granted in its entirety.

UNITED STATES DISTRICT COURT
For the Northern District of California

III.     Damages

The final motion before the court raises several issues concerning what damages plaintiff may be entitled to upon proof of infringement at trial.  Specifically, defendant moves for summary judgment that plaintiff cannot recover damages for its own lost profits to the extent that those profits accrued prior to the date on which plaintiff acquired the patents in suit.  In addition, defendant's motion raises questions regarding the legal sufficiency of the royalty rates calculated by plaintiff's damages expert.  The court addresses each of these issues below.

A.     Plaintiff's Pre-assignment Lost Profits

The first issue raised by defendant's motion for summary judgment on damages pertains to plaintiff's prayer for an award of lost profits.  Under section 284 of the Patent Act, 35 U.S.C. § 284, a patentee is entitled to receive damages that are "adequate to compensate for the infringement."  Id.  While the statute itself offers little guidance as to what amount of damages is "adequate," the Federal Circuit has made clear that a patentee may claim damages arising from lost profits due to diverted sales, price erosion, and increased expenditures upon proof that such losses are attributable to a defendant's infringement.  Minco, Inc. v. Combustion Eng'g, Inc., 95 F.3d 1109, 1118 (Fed. Cir. 1996) (citing Lam, Inc. v. Johns-Manville Corp., 718 F.2d 1056, 1065 (Fed. Cir. 1983)).

Nonetheless, as with other causes of action sounding in tort, damages in a patent infringement action require the plaintiff to establish both "but for" and proximate causation.  See Rite-Hite Corp. v. Kelley Co., 56 F.3d 1538, 1545-46 (Fed. Cir.) (en banc), cert. denied, 516 U.S. 867 (1995).  With respect to the former, the patentee must submit evidence establishing to a "reasonable probability" that but for the infringement, it would have made the profits for which it seeks compensation.  Id. at 1545 (citations omitted); see also Minco, 95 F.3d at 1118.  As for proximate causation, the Federal Circuit's en banc decision in Rite-Hite confirmed that the common law standard of "reasonable objective, foreseeability" applies.  See 56 F.3d at 1546.  Thus, "[i]f a particular injury was or should have been reasonably foreseeable by a particular competitor in the relevant market, broadly defined, that injury is generally compensable absent a persuasive reason to the contrary."  Id.

As noted above, plaintiff acquired the three patents in suit for Auspex, the developer of the patented file servers and operating system, in June 2003.  There is no dispute that plaintiff is entitled to

1   recover lost profits attributable to infringing sales to the extent that those profits accrued after that date.

2   Moreover, in purchasing Auspex's patents, plaintiff acquired the right to "to recover all past damages and

3   other potential relief arising from infringement of the . . . Patents assigned by this Agreement."  Stanton

4   Decl., Exh. 3 § 2.2 (Asset Purchase Agreement).  The parties agree that this provision of the purchase

5   agreement permits plaintiff to recover damages in the amount of lost profits that Auspex suffered prior to

6   the date of assignment.  However, plaintiff also claims that it is entitled to damages for the sales of *its own*

7   *products* prior to the June 2003 assignment date, provided that it can show that those sales would have

8   been made but for defendant's infringement.

9        At first glance, plaintiff's claim for pre-assignment lost profits would appear to be foreclosed by

10   long-established precedent holding that a plaintiff seeking money damages for patent infringement must have

11   held legal title to the patent at the time of the infringement. See Rite-Hite, 56 F.3d at 1551 (citing Crown

12   Die & Tool Co. v. Nye Tool & Machine Works, 261 U.S. 24, 40-41 (1923)).  However, plaintiff argues

13   that a contrary result is dictated by the Federal Circuit's Minco decision, see 95 F.3d at 1109.  The Minco

14   case involved a patented process for producing fused silica, which was developed by the founders of

15   Minco, Inc. Id. at 1113.  Although Minco's founders obtained a patent for the process in 1980, Minco

16   itself owned no rights in the invention until October 1988, when an investment group acquired the company

17   and the patent that it practiced in separate transactions. Id.  Nonetheless, upon finding that one of Minco's

18   competitors in the fused silica market infringed the patented process, the district court awarded Minco both

19   lost profits and a reasonable royalty for sales that occurred prior to the date of the assignment. Id. at 1118.

20   The Federal Circuit affirmed. Id.

21        Plaintiff interprets Minco as granting *carte blanche* to patent assignees seeking to recover lost

22   profits based on their own pre-assignment sales of a competing product.  The court might agree if it were

23   inclined to view Minco's holding in a vacuum, divorced from the factual context in which the case arose.

24   However, what was dispositive in Minco was not the formal assignment of the patent (or the lack thereof),

25   but rather the fact that the defendant could have reasonably foreseen that a competitor practicing the

26   invention would be injured by its infringing sales. See id. at 1118.  Indeed, it would hardly be reasonable to

27   conclude otherwise, given that Minco was practicing a patent owned by the company's founders and

28   shareholders.  In light of these circumstances, the Federal Circuit correctly looked to the substance of the

20

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1   relationship between the company's founders and the plaintiff and upheld the district court's award of

2   damages arising from acts of infringement that predated the formal assignment of the patent.

3         Those circumstances stand in stark contrast to the case at bar.  While it is true that plaintiff, as a

4   participant in the market for network file servers, might have been injured by defendant's allegedly infringing

5   sales, the same could be said of any of defendant's competitors.  The only difference between plaintiff and

6   those other competitors, who are not pursuing infringement actions against defendant and undisputedly lack

7   standing to do so, is that plaintiff subsequently acquired Auspex's patents in bankruptcy proceedings.

8   Unlike the assignee in <u>Minco</u>, plaintiff has *never* practiced the patented inventions, either before or after the

9   date on which it acquired the right to do so.  In light of this fact, it would defy common sense to conclude

10  that defendant should be held liable for pre-assignment damages incurred by plaintiff and not for those

11  incurred by other competitors simply because plaintiff acquired Auspex's patent rights and others who

12  suffered the same type of injury did not.  Such a conclusion would also be contrary to <u>Rite-Hite</u>'s

13  requirement that a particular injury must be reasonably foreseeable if it is to be included in a patentee's lost

14  profits award.  <u>See</u> 56 F.3d at 1546.

15        In short, the court finds the <u>Minco</u> decision to be easily distinguishable from the case at bar.  Thus,

16  seeing that there is no reason to depart from the ordinary rule that one seeking money damages for patent

17  infringement must have held legal title to the patent at the time of the defendant's infringement, <u>see</u> <u>Rite-Hite</u>,

18  56 F.3d at 1551, the court holds that plaintiff is not entitled to recover damages for its own lost profits to

19  the extent that those damages accrued prior to the date on which it acquired the patents in suit.

20  Defendant's motion for summary judgment as to that issue is therefore granted.

21

22

23

24

25

26

27

28

B.   Royalty Calculations

The second issue raised by the defendant's motion on damages involves plaintiff's claimed entitlement to a reasonable royalty on defendant's infringing sales.  A prevailing plaintiff in a patent infringement action who is unable to prove the amount of its lost profits may seek compensatory damages based upon "a reasonable royalty for the use made of the invention by the infringer."  35 U.S.C. § 284; see also Grain Processing Corp. v. American Maize-Prods. Co., 185 F.3d 1341, 1349 (Fed. Cir. 1999).  The Federal Circuit has also recognized the propriety of "mixed" awards in circumstances where a patentee is only able to establish a portion of its lost profits, thereby permitting damage awards to be comprised of lost profits to the extent they are proven with a reasonable royalty accounting for the remainder.  State Indus., Inc. v. Mor-Flo Indus., Inc., 883 F.2d 1573, 1577 (Fed. Cir. 1989) (citing TWM Mfg. Co. v. Dura Corp., 789 F.2d 895, 898 (Fed. Cir. 1986)), cert. denied, 493 U.S. 1022 (1990).

Plaintiff seeks such a mixed damage award in the instant action.  To calculate the total amount of damages, plaintiff's expert, Michael J. Wagner, has constructed two scenarios.  Under the first of these scenarios, Wagner assumes that plaintiff will be able to establish lost profits damages.  Stanton Decl., Exh. D at 1-3 (summarizing Wagner's expert report).  Accordingly, he calculates damages equal to the sum of those lost profits plus additional revenues that plaintiff would have made by licensing its patents to defendant, applying a 7% royalty rate to arrive at the latter figure.  Id.  Alternatively, Wagner posits a scenario in which lost profits cannot be established to a reasonable certainty, thereby requiring damages to be calculated based on the amount of a reasonable royalty.  Id.  However, rather than using the 7% rate that he employed in arriving at the proper amount of a mixed award, Wagner calculates the amount of the royalties-only award based on a royalty rate of 23%.  Id.  Wagner's explanation for this difference is straightforward.  According to his expert report, a patentee who would have made a certain number of sales of its own products but for a defendant's infringement would have also elected to license its patent to the infringer if the infringing product could have been sold to customers that the patentee would not otherwise reach.  Id. at 25-26.  Thus, because those remaining sales would not have reduced the patentee's own market share, it would have been willing to grant a license at a lower royalty rate.  Id.

Defendant argues that Wagner's use of different royalty rates to calculate the amount of the mixed and royalties-only damage awards is as a matter of law inappropriate, citing numerous cases that stand for

22

1  the proposition that lost profits and reasonable royalties are "analytically different approaches" to the

2  calculation of damages in patent infringement actions.  See, e.g., Hartness Int'l, Inc. v. Simplimatic Eng'g

3  Co., 819 F.2d 1100, 1112 (Fed. Cir. 1987); see also Radio Steel & Mfg. Co. v MTD Prods., Inc., 788

4  F.2d 1554, 1557 (Fed. Cir. 1986) (observing that "[t]he determination of a reasonably royalty . . . is based

5  not on the infringer's profit, but on the royalty to which a willing licensor and a willing licensee would have

6  agreed at the time the infringement began").  However, there is nothing about Wagner's theory to suggest

7  that plaintiff is seeking double recovery for the same loss, nor is there any reason to believe that Wagner is

8  basing his reasonable royalty calculations on anything other than the outcome of a hypothetical licensing

9  negotiation.  Such an approach to calculating a reasonable royalty rate is entirely consistent with Federal

10  Circuit law.  See, e.g., Riles v. Shell Exploration & Prod. Co., 298 F.3d 1302, 1311 (Fed. Cir. 2002).  As

11  for the soundness of Wagner's methodology, that is a matter of economics rather than a question of law.

12  For that reason, it is an issue that falls within the province of the jury.  The court therefore denies

13  defendant's motion for summary judgment with respect to this issue.

14

15  CONCLUSION

16       For the reasons stated above, the court GRANTS defendant's motion for summary judgment that it

17  has not infringed claims 1 through 9 and claims 11 through 13 of the '037 Patent and DENIES defendant's

18  motion for summary judgment of infringement with respect to claims 1 and 7 of the '037 Patent.

19  Furthermore, the court GRANTS defendant's motion for summary judgment of noninfringement with

20  respect to claims 5 through 9 of the '366 Patent and claims 1, 2, 4, and 5 of the

21

22

23

24

25

26

27

28

'918 Patent.  In addition, defendant's motion for summary judgment on damages issues is GRANTED IN PART and DENIED IN PART.

      IT IS SO ORDERED.

Date:   June 27, 2005

                                 MARILYN HALL PATEL
                                 District Judge
                                 United States District Court
                                 Northern District of California

**UNITED STATES DISTRICT COURT**
For the Northern District of California

24

1

UNITED STATES DISTRICT COURT
For the Northern District of California

**ENDNOTES**

2

1.  To be more specific, both BlueArc Servers have network interface and storage interface boards respectively corresponding to the servers' network interface and storage interface modules.  Joint Statement Re '366 and '918 Patents ¶ 1.  With respect to their file system modules, the servers differ in that Silicon Server's file system module consists of a single file system board, whereas the Titan's file system module includes two file system boards (the "FSA" and "FSB" boards).  Id.

3

4

5

2. In the Silicon Server, separate microprocessors are located on the network interface, file system, and storage boards.  Joint Statement Re '366 and '918 Patents ¶ 2.  The Titan also includes three microprocessors, which are respectively associated with the network interface board, one of the file system boards (the FSA board), and the storage interface board.  Id.  The Titan's FSB board does not include a microprocessor.  Id.

6

7

8

3.  Plaintiff subsequently withdrew its infringement contentions with respect to claims 11 and 16 of the '918 Patent and claim 4 of the '366 Patent.

9

4.  While plaintiff argues that two "distinct" sets of peer-level facility functions can be mutually overlapping, it cannot reasonably be disputed that one "respective distinct" set of functions cannot be substantially identical to another "respective distinct" set.  Indeed, to conclude otherwise would effectively eliminate the "respectively distinct" limitation from the claim, leaving the patent to read on any processing unit that performs any "set" of functions.  Thus, one "respective distinct" set of functions must at a minimum be distinguishable from another "respective distinct" set of functions in some substantial aspect of its composition.  The sets of functions performed by the microprocessors located on the network and storage interface modules of the BlueArc Servers do not meet this limitation.

10

11

12

13

14

5.  In light of this conclusion, the court does not reach defendant's argument that prosecution history estoppel bars plaintiff's attempt to establish infringement of the '037 Patent under the doctrine of equivalents.

15

16

6.  While it also undisputed that the BlueArc Servers do not employ the LNFS format, the court assumes without deciding that LNFS is equivalent to the "whizzy disk protocol" ("WDP") format that the accused devices use for the purpose of internal communications.  See Joint Statement Re Infringement of '366 Patent Claims 1, 3, and 4 ¶¶ 9-10.

17

18

19

20

21

22

23

24

25

26

27

28